[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 6, 2005
THOMAS  K. KAHN
CLERK

_____

No. 04-10717
Non-Argument Calendar
_____

D. C. Docket No. 03-00253-CR-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDWIN W. WILLIAMS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(May 6, 2005)**

Before BIRCH, BLACK and PRYOR, Circuit Judges.

PER CURIAM:

Edwin W. Williams appeals his concurrent 262-month sentences imposed after he pled guilty to six counts of commercial business robbery, in violation of 18 U.S.C. § 1951. Because we have determined that Williams failed to establish plain error in his sentence enhancement for brandishing or possessing a gun during the robberies or clear error in the denial of a downward departure for acceptance of responsibility, we AFFIRM.

## I. BACKGROUND

According to the presentence investigation report ("PSI"), Williams committed six robberies of fine jewelry counters at Dillard's, Sears, Rich's and Belk stores in malls in Savannah, Georgia.[1] In five out of the six robberies, the victim clerk behind the jewelry counter stated that Williams possessed a firearm when he robbed the jewelry counter. All six victims reported that Williams threatened to shoot or kill them.

In an interview with a probation officer following his arrest, Williams stated that he did not possess a firearm during the robberies but admitted that, during one

---

[1] The six jewelry robberies in Savannah malls were: (1) Finlay Fine Jewelry in Dillard's at Savannah Mall on January 4, 2002, in the amount of $93,445.91, R1-1 at 1 (Count One); (2) Finlay Fine Jewelry in Rich's at Oglethorpe Mall on March 2, 2002, in the amount of $50,445, id. at 2 (Count Two); (3) Finlay Fine Jewelry at the Belk store in Savannah Mall on March 17, 2002, in the amount of $153,150, id. at 2-3 (Count Three); (4) Sears at Oglethorpe Mall on April 2, 2002, in the amount of $60,114.86, id. at 3 (Count Four); (5) Finlay Fine Jewelry at the Belk store in Savannah Mall on May 6, 2002, in the amount of $100,020, id. at 4 (Count Five); and (6) Finlay Fine Jewelry in Dillard's at Savannah Mall on May 27, 2002, in the amount of $59,631.84, id. at 5 (Count Six).

2

of the robberies, he placed his hand in a black bag, which might have appeared to be a gun. He also stated that he never threatened to shoot or kill anyone. Williams pled guilty to six counts of robbery of a commercial business in violation of 18 U.S.C. § 1951.[2] At the plea hearing, Williams admitted to the essential elements of his offenses, but he maintained that he did not have or display a gun at any of the robberies.

The probation officer calculated Williams's base offense level at 20 for each of the six counts, pursuant to U.S.S.G. § 2B3.1(a) (2003). The officer increased this base offense level by 5, pursuant to § 2B3.1(b)(2)(C), for Counts One-Three and Five-Six, since Williams brandished or possessed a firearm during those robberies as attested by the victim sales clerks. The probation officer also increased Williams's base offense level by 2 for all counts, pursuant to § 2B3.1(b)(7)(C), since the fair market value of the merchandise stolen was more than $50,000. For Count Four, the probation officer increased the base offense level by 2, pursuant to § 2B3.1(b)(2)(F), because Williams issued a threat of death

---

[2] Because he waived indictment, the six-count information to which Williams pled guilty was for violation of 18 U.S.C. § 1951 for commercial business robbery, with each count being one of the robberies at issue in this case. Williams is not specifically charged with possessing a gun during the robberies. Instead, the same language occurs in each count and describes the particular robbery of a victim sales clerk as being "by means of threatened force, violence, and fear of injury; when the natural consequences of such act of robbery would be to delay, interrupt or adversely affect commerce and the movement of articles and commodities in commerce." R1-1 at 1, 2, 3, 4, 5.

to the victim sales clerk during that robbery. Because the probation officer calculated the offense level cumulatively without counting any enhancement more than once for all six counts, the combined adjusted total offense level was 32. The officer also found that Williams was not entitled to a reduction for acceptance of responsibility because his denial of possessing a firearm amounted to a false denial of relevant conduct. The probation officer additionally classified Williams as a career offender under U.S.S.G. § 4B1.1(a). With an offense level of 32 and a criminal history category of VI, Williams's applicable sentencing range was 210 to 262 months of imprisonment. U.S.S.G. Ch. 5, Pt. A.

Williams objected to the five-level enhancement under § 2B3.1(b)(2)(C) in his offense level for possession of a firearm as well as the denial of a reduction in his offense level for acceptance of responsibility under § 3E1.1 for falsely denying his possession of a firearm. He argues that his offense level should have been 29 instead of 32, which would have yielded 151 to 188 months of imprisonment. At sentencing, the district judge found that Williams had used a firearm during the subject robberies based on the evidence of (1) two credible witnesses, victim sales clerks who had testified that Williams had a gun during their respective robberies, R2 at 23; (2) a videotape of a subsequent robbery of a jewelry counter within a store showing that Williams had a gun , id. at 23-24; (3) Williams's prior

4

convictions for armed robbery, id.; and (4) his possession of a gun at his arrest like the one "described by two very credible witnesses," id. at 24. The district judge determined that, because Williams had used weapons during the subject robberies, as the victim sales clerks attested, he was not entitled to a reduction for acceptance of responsibility. Considering the counts cumulatively, the judge sentenced Williams to a concurrent sentence of 262 months of imprisonment.

On appeal, Williams argues that the district court erred when it sentenced him based on his using a firearm during the robberies to which he pled guilty because that fact was not admitted by him or proven to a jury. Therefore, he argues that his sentence was impermissible according to the law established in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), and Blakely v. Washington, 542 U.S. __, 124 S.Ct. 2531(2004). Williams did not raise this issue in district court. He also argues on appeal that the district court erred by refusing to grant him a reduction for acceptance of responsibility, since he pled guilty to all counts.

Because Williams's Apprendi/Blakely issue implicated the constitutionality of the United States Sentencing Guidelines and the Supreme Court now has decided United States v. Booker, 543 U.S. __, 125 S.Ct. 738 (2005), we requested that counsel file supplemental briefs concerning the applicabilty of the Sentencing

5

Guidelines in this case under the plain-error review standard. We have considered

counsel's responsive briefs and now explain our decision in view of Booker.

## II. DISCUSSION

A. Enhancement for Gun Possession During the Robberies

Williams first argues that the district court erred by enhancing his sentence

under § 2B3.1(b)(2)(C) for brandishing or possessing a firearm during the

robberies. Since Williams did not make this objection in district court, our review

is for plain error. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.

2005), petition for cert. filed, 73 U.S.L.W. 3531 (U.S. Feb. 23, 2005) (No. 04-

1148). Under this review standard, we can correct an error only if there was "'(1)

error, (2) that is plain, and (3) that affects substantial rights.'" Id. (quoting United

States v. Cotton, 535 U.S. 625, 631, 122 S.Ct. 1781, 1785 (2002)). The defendant

has the burden of persuasion as to prejudice regarding the third part of the analysis.

Id. at 1299. Provided these three conditions are met, we have discretion to correct

a forfeited error "'only if (4) the error seriously affects the fairness, integrity, or

public reputation of judicial proceedings.'" Id. at 1298.

Concerning the first part of the analysis, the district judge, based on his

factual findings from the evidence presented to him at sentencing, enhanced

Williams's sentence by five levels under § 2B3.1(b)(2)(C) for brandishing or

possessing a gun during the robberies, a fact not found by a jury because of Williams's pleading guilty. Since at the time of sentencing, the judge considered the Sentencing Guidelines to be mandatory, this was Booker error. Id.; see Booker, 543 U.S. at __, 125 S.Ct. at 756. Because this error was plain "'at the time of appellate consideration,'" the second part of the plain-error analysis is met. Rodriguez, 398 F.3d at 1299 (quoting Johnson v. United States, 520 U.S. 461, 468, 117 S.Ct. 1544, 1549 (1997)).

The task for Williams, who bears the burden of persuasion regarding the third part of the plain-error analysis, is that he must show that the error "'affected the outcome of the district court proceedings.'" Rodriguez, 398 F.3d at 1299 (quoting Cotton, 535 U.S. at 632, 122 S.Ct. at 1786). That is, he must demonstrate "that the error actually did make a difference" in his sentence. Id. at 1300. If we have to speculate concerning the result in the district court without the error, then "the appellant has not met his burden of showing a reasonable probability that the result would have been different but for the error; he has not met his burden of showing prejudice; he has not met his burden of showing that his substantial rights have been affected." Id. at 1301.

Importantly, Booker did not change the Sentencing Guidelines extra-verdict enhancements in any way: "The same extra-verdict enhancement provisions apply

7

after Booker as before." Id. at 1300. While the Sentencing Guidelines after

Booker are advisory rather than mandatory, we have recognized that a re-

sentencing before the district court would involve "exactly the same evidence

presenting exactly the same factual issues that it has already resolved, and it would

be required to at least consider exactly the same guideline enhancement provisions

it has already applied." Id. at 1300-01. Consequently, in deciding the third part of

the plain-error analysis, "we ask whether there is a reasonable probability of a

different result if the guidelines had been applied in an advisory instead of binding

fashion by the sentencing judge." Id. at 1301. This analysis necessarily is a case-

by-case determination.

In this case, which involves a guilty plea as opposed to a trial, we do not

have to speculate concerning what the district court would do if we remanded this

case for resentencing. At the sentencing hearing, two of the victim sales clerks

who were robbed by Williams testified that he had a gun during their respective

robberies.[3] The first victim sales clerk who testified, Shannon A. Lyon, described

_____

[3] Three of the victim sales clerks who were robbed actually were present at the
sentencing hearing, but the third victim sales clerk was eight months pregnant and had been
involved in "serious counseling" as a result of the robbery. R2 at 3. Accordingly, she requested
that she not have to testify to which the government and judge agreed, provided the government
summarized her testimony, which was done by the Assistant United States Attorney ("AUSA"):

> We have three of the [victim sales] clerks here today. As I have discussed
> with you just a moment ago, Your Honor, one of the clerks is here today,
> but I do not intend to call her to the stand. That is Jocelyn Rowe. And

8

the gun that Williams possessed during the robbery and also threatened to use to shoot customers or her if she did not cooperate by giving him the jewelry that he wanted:

> Assistant United States Attorney ["AUSA"]: Were you a sales associate at Fin[]l[a]y Fine Jewelry Store at Rich's in Oglethorpe Mall on March 2nd of 2002?
> LYON: Yes.
> AUSA: Were you working on that day?
> LYON: Yes.
> AUSA: What were you doing on that day?
> LYON: I was working behind the jewelry counters to help customers buy jewelry.
> AUSA: Did you come into contact with the defendant on March 2nd of 2002 while working for Findl[a]y Fine Jewelry?
> LYON: Yes.
> AUSA: Could you describe for the Court the circumstances surrounding your encounter with the defendant?
>     . . . .
> LYON: I walked over to the counter. And he said he was looking . . . for an anniversary ring for his wife. And I said, oh, that's a great selection. And he asked to see one of our large princess cut with bag[u]ett[e] diamonds on either side of the ring. So, I opened the case, and I pulled it out, and I handed it to him.
>     And he looked at it, and he said well, I think I m[a]y like that other one better. So, I took the first ring back and put [it] in the case, pulled out a second ring that he wanted to look at. And he said, no, I

---

that relates to the January 4th of 2002 hijack robbery, a jewelry store robbery in a Fin[]l[a]y Fine Jewe[lr]y store in Dillard's at the Oglethorpe Mall, which the defendant robbed the store of $93,000. And Ms. Rowe's statements to both the police as well as to Suzanne Mingledorff, the probation officer, w[ere] that during the robbery Mr. Williams pulled back his jacket to reveal that he had what she believed to be a black 9-millimeter pistol.

R2 at 7.

9

like the first one better.  So, I put that one back in the case.  Pulled out the original ring.  He's holding this with his left hand.  He stuck his right hand in his jacket pocket and removed a white bag and put it on the counter.  He said this is a robbery and it is not a joke.

And I didn't think I really heard him right.  And I was kind of like oh, yeah, whatever.  And apparently, he knew—recognized that I didn't understand what he was saying.  So, he removed from the same pocket a revolver, because I could see the side of the barrel.  And he said this is a robbery.  And I said okay.

AUSA: What did the revolver look like?

LYON: I remember it was stainless steel, shiny looking.  And smaller, it was about that big [gesturing].

At this time I realize what was going on.  And he said for me to start removing the 14-car[a]t gold watches.  So, I started picking them up off the pad one by one, and put them in the bag.  And he said you've got to move faster, you've got to move faster.

And I said okay.  And then he said, now go to [the] diamond bracelet counter, because the diamond bracelets are sitting right next to it.  So, I started putting those in the bags.  He said do the whole pad, pick up the whole pad, and dump it in there.  So, I did.

And then he said, give me some of those rings over there.  So I started picking up rings.  I finally asked him, I said is this enough.  And he goes yeah, that's fine.  And he said give me the bag.  And I handed him the bag.  And he looked at me in the eye, and he said "if you call security I will shoot you, and I'll start shooting customers."

AUSA: What did he do to the revolver during this time period?

LYON: It was in his—he had put his hand back in his pocket to kind of cover it up.  And it was pointed at me.  So, I could see it was in my direction.

AUSA: And then after he told you that if you advised anybody he would shoot you and start shooting customers, what happened after that?

LYON: He proceeded to walk off to my left side around the case.  And I thought he was leaving out of the east door.  I went to shut my door, but there was a diamond bracelet left in it.  So, I picked it up and threw it in there, and I shut it.  And at this point, I think that he's gone.  I turned to go call security, and he's still standing there by the 14-car[a]t gold earrings in the locked section, which is on that side.

10

And he looked at me and again he pulled out the gun partially, and he said, "I will shoot you."

At this point, I realize the severity of the situation, and I turned around. I was freaking out. I didn't know if he was going to shoot me in the back. I didn't know anything.

AUSA: What happened after that?

LYON: Two ladies were coming down the escalator who also work for Rich's. And I knew that I couldn't say anything, because if he was still standing behind me, there was a possibility that he would shoot me or them. So, I had to get their attention.

So, I started crying. And I got their attention, and they came over and asked me if everything was okay. And I asked them if there was a black gentleman standing behind me and they said no. And I said, I've just been robbed. You need to call security.

And that's when I went to hit the panic button.

Id. at 8-12.

The second victim sales clerk witness, who was robbed and testified at

Williams's sentencing, was Kevin Todd:

AUSA: Mr. Todd, let me direct your attention to May 6th of 2002. Were you employed during this time period?

TODD: Yes.

AUSA: Where were you employed?

TODD: Fin[]l[a]y Fine Jewelry at the Savannah Mall, Belks.

AUSA: And what was your job there?

TODD: Full time salesclerk.

AUSA: On May 6th of 2002, were you working that day?

TODD: Yes.

AUSA: And on May 6th of 2002, did you come into contact with the defendant?

TODD: Yes, sir.

AUSA: Okay. Could you describe to the Court your encounter with the defendant on May 6th of 2002?

TODD: While I was preparing to enter sales into the computer, when out of the corner of my glasses I noticed someone was stand[ing]

11

behind me. I got up to ask if someone needed any assistance. At first he said no, he was just looking. So, I went to dusting off the counter, cleaning, just to look busy, and, you know, wait to see if he needed anything.

Then he asked to see a bracelet in the counter. It was a—if I remember correctly, it was a 10-car[a]t diamond bracelet. I took it out, showed it to him, and he said he was shopping for a Mother's Day gift.

When I handed him the bracelet, he put it in his pocket, handed me a bag with the other hand, and then produced a gun which he held at hip level and told me that this was a robbery and to start filling the bag.

AUSA: The gun that you saw, could you describe it for t[he] Court, please?

TODD: It was a small—between a ta[]nish to a copper color revolver.

AUSA: And what did he do after he patted to his side, what did he do with the gun?

TODD: He waited until I started putting jewelry in the bag. And then he put the gun back in his pocket. But he didn't take his hand off of it.

AUSA: Could you see the barrel pointing out of his clothes?

TODD: No. The level of the counter was above his pocket line.

AUSA: Okay. After he put the gun back into his pocket, what happened after that?

TODD: I started putting the jewelry in the bag, the pieces that he had specifi[]ed. At first, I, you know, tried to put the whole panel plates in the bag. He said, no, no, just the jewelry and the fingers that they [we]re on.

He pointed out to the bracelets and the rings. I put those in there. Handed him the bag, and then he told me to get on the floor and not get up.

AUSA: Did he make any threatening comments to you at all?

TODD: The only comment he said is don't do anything stupid, and you won't get hurt.

AUSA: And after you laid on the floor, what happened next?

TODD: I gave him about—I'd say three to five seconds. I got up and yelled, "Chris, someone just robbed me. See if you see him."

12

Id. at 13-16.

Following this testimony, the court received into evidence and the government played a videotape of Williams's robbery of a Sears jewelry store in Jacksonville, Florida, on May 15, 2002, where it appeared that Williams proceeded as in five of the six robberies at issue in this case by displaying a gun. The prosecutor further noted that, when Williams was arrested in Indiana, a gun matching the description of the revolver described by the victim sales clerks in this case, was found in his car.[4] Based on statements and testimony of the robbed victim sales clerks in this case, Williams's continued use of a gun in subsequent jewelry robberies matching the one described by the robbed victim clerks, and Williams's possession of apparently the same gun at the time of his arrest, the government contended that "the evidence is overwhelming, certainly beyond a preponderance that the defendant used a gun during five of the six of these jewelry store robberies here." R2 at 19.

Nevertheless, Williams has maintained that he did not use a gun during these robberies, which went against the evidence and testimony in the case and was recognized by the district judge, the AUSA, and the probation officer, who

---

[4] At Williams's sentencing, the AUSA stated: "Also, Your Honor, when he was arrested in Indiana, there was a silver, chrome, ta[]nish revolver that was found in his car." R2 at 19.

prepared Williams's PSI.[5]   The district judge's exchange with Williams at

---

[5] At Williams's sentencing, the AUSA made the following observations after the viewing of the videotape: "Your Honor, this is Mr. Williams approaching, and he's bringing something out of his pocket.  It is that right there that obviously the government contends it is pretty clear that he is holding a gun."  R2 at 18.  The district judge then asked the probation officer if she wished to substantiate her findings in the PSI:

> PROBATION OFFICER: Your Honor, I don't know that there is anything that I can add except to reiterate that he did tell the Court that he never had a gun or used a gun during any of the robberies.
>
> Also, when I interviewed him a few days after his pleading—and actually I anticipated Your Honor, this would be an issue.  And I basically read Mr. Williams the riot act and, what would happen if he continued to maintain that he didn't possess a gun in the face of overwhelming evidence to the contrary.  And he still insisted he did not have a gun.
>
> As [the AUSA] said, five of the six victims in Savannah said that they clearly saw a gun and they have consistently maintained this.  I was able to track down three of them, two of them whom you have heard from today.  They have continued to maintain that they clearly saw a gun.
>
> And just something to add, Your Honor.  <u>Not only has Mr. Williams denied that he had a gun during the robbery, he denied that he ever made any kind of threatening statement to any of these victim clerks.</u>  He said the most that he would ever do, he told me, was that he would tell them if you cooperate you won't get hurt.
>
> But full notice, Your Honor, the victim clerks have said that he [said] something in most cases much more explicit than that as to what he would do to them if they refused to comply.
>
> Again, as [the AUSA] mentioned, when [Williams] was arrested July 2nd of 2002, which was only about a month, a little over a month, Your Honor, after his last robbery here in Savannah, he possessed a loaded silver .32 caliber revolver that was very similar to the descriptions of the gun that was given by the clerk.
>
> And, Your Honor, he has admitted to other department stor[e] robberies to me that he has not been charged with, for instance, the one that you just saw the videotape of.  He did . . . [tell] me that he did a couple of robberies in Jacksonville during the same time period.  Yet, I think, Your Honor, in my opinion, if you look at that videotape, he clearly possessed a gun.
>
> And I would emphasize, Your Honor, that <u>he told me that he at no time during any of the robberies he committed during this time period that he ever possessed a gun.  Well, it is clear that he did.</u>
>
> COURT: I notice in Riverside, California in '83, he was convicted of robbery with a handgun under an alias.  And there are certain other robbery and robbery attempts in Los Angeles and San Berna[r]dino, and robbery with a handgun in

14

sentencing explains his reasons for sentencing Williams at the upper level of the

Sentencing Guidelines, including the five-level enhancement for brandishing or

possessing a gun during the robberies:

> THE COURT: . . . Mr. Williams, you understand what is at issue here.
> DEFENDANT: Yes, Your Honor.
> THE COURT: <u>You have denied that you use[d] a handgun.  And you made that statement to me here at that time of the Rule 11 proceeding while you were under oath.  The probation officer said you still contend that.  And you have heard the testimony of two clerks.  I have observed a videotape that it appears to me that you had a gun.</u>  And I make note of your record and the number of robberies and other criminal charges and convictions you have had.
>       <u>Do you still deny that you used a handgun in these robberies?</u>
> DEFENDANT: <u>Yes, Your Honor.  I didn't have a handgun.</u>  I've always had my hand as though maybe I had a gun.  And I told them that I would hurt them, and I might have said I would shoot them.  But I never pulled out no gun.
>       I couldn't see the one from Jacksonville.  I wasn't indicted on it.  But I couldn't see it.  If I had anything in my hand, it was a black bag.  It wasn't a gun.
>       . . . .
> THE COURT: Well, <u>the Court</u>, as I noted, <u>listened to two very credible witnesses.  I have looked at the videotape.</u>  And obviously, I can't tell but <u>it certainly appears that he had a weapon on that occasion.  Then you look at his convictions for armed robbery and, the fact that at the time of his arrest in Indiana that he possessed a weapon that was similar to that weapon described by two very credible witnesses.</u>

---

Los Angeles in '78.

<u>Id.</u> at 19-21 (emphasis added).

15

The Court has no hesitancy finding that the probation officer got it right and the factual statements contained in the Presentence Report are correct.

. . . .

[T]he question of guidelines application that arose as to the conclusions reached and contained in Paragraph 21, 28, 35, 49, 75, 76, and 136, the Court has no hesitancy, none at all, to adopt the probation officer's conclusions as stated in the addendum, and find that the defendant did use weapons, and therefore, loses the reduction for acceptance of responsibility.

The Court determines the applicable guidelines are a Total Offense Level of 32, a Criminal History Category of VI, indicating 210 to 262 months imprisonment, two to three years of supervised release, [$]17,500 to $175,000 fine. Restitution in the amount of $516,807.61 that is for the lost jewelry is also an option. And $600 special assessment.

Now, I have denied—I have said I don't believe you, Mr. Williams. And I have not one shadow of a doubt that you have lied to the probation officer. You have lied to the police, and you have lied to me. So, that does not serve you well here. But, I want to tell you that if you have any information in mitigation of this sentence, anything you want to tell me about yourself or adduce any evidence, the Court, of course, will listen.

. . . .

DEFENDANT: Okay. Your Honor, the only thing that I would like to say that, you know, like I'm very remorseful about it. Things just got out of hand. I did one, and then I just kept doing them. You know, I did this in the '70's as you can see. And I haven't had—you know, did no robberies or nothing like that. I've been in trouble and I haven't been out much.

And they just got out of hand. I just got addicted to it, and I done them. But my intention wasn't to hurt anybody. I never hurt anybody in anything, never pulled out any weapon.

And like I said, I'm sorry. That's it.

. . . .

THE COURT: Well, in reading the Presentence Report and seeing the amount of research that went into it by the government and by the probation office, I am rather struck that no one got injured in any of

16

these numerous robberies, and the great amount of proceeds of which owners were deprived, over a half million dollars that we know of.

. . . .

It is a frightening episode and frightening conduct. Those various clerks will remember those incidents forever. And your record is abysmal. And as you said, I don't know why you did it.

. . . .

Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant, Edwin Williams, is committed to the custody of the Bureau of Prisons to be imprisoned for a term of 262 months as to each of Counts 1 through 6, to be serve[d] concurrently.

This sentence shall run consecutively to the state sentence of imprisonment the defendant is presently serving. The Court finds no reason to depart from the sentence called for by the application of the guidelines.

Since that range exceeds 24 months, the Court must give its reasons for imposing the selected sentence. Among the other things I have said, I would readdress part of my reasons.

As I told Mr. Williams, he has falsely denied relevant conduct to the instant offense, that is his possession of a firearm during those offenses. Why he persisted in that, I do not know since he was arrested with a weapon. Credible witnesses identified him and the weapon. And all of the evidence points to that fact.

The amount of exposure to great and permanent harm or death to which he gratuitously imposed his will upon the various clerks makes him a frightening person.

Now, because the defendant has falsely advised the Court and persisted, and his substantial criminal record is replete with violent offenses, the Court has sentenced the defendant at the upper end of the guideline range.

Id. at 21-22, 23-28 (emphasis added).

Because of the victim sales clerks' testimony at Williams's sentencing resulting from his guilty plea as well as the district judge's commentary, we know

17

that there is not a reasonable probability that the Sentencing Guidelines would have been applied differently if the judge had known that they were advisory instead of mandatory. In fact, the judge stated that the highest imprisonment period given by the Sentencing Guidelines for Williams's offense level, plus his being a career offender, comported with his determination of an appropriate sentence and that a downward departure was not warranted. R2 at 27. Additionally, the judge's making Williams's sentence concurrent for the six robberies instead of consecutive further shows his discretionary consideration of the Sentencing Guidelines in determining Williams's appropriate sentence, which is proper and acceptable under Booker. 543 U.S. at __, 125 S.Ct. at 764 (citing 18 U.S.C. § 3553(a)(4)).

Significantly, § 2B3.1(b)(2)(C) is a single-incident enhancement, which means that, for each robbery to which Williams pled guilty and possessed a gun, this five-level upward adjustment was available to increase his offense level. From statements by victim sales clerks, the PSI reveals Williams brandished or possessed a gun during five of the six robberies. The district judge explicitly stated on the record at Williams's sentencing that he found the two victim clerks who testified were credible. Instead of applying the § 2B3.1(b)(2)(C) enhancement for each robbery where there was evidence that Williams brandished or possessed a gun, an option available to the judge at the time of sentencing which was unaffected by

18

<u>Booker</u>, the district judge applied this five-level enhancement only once in Williams's total offense level.

The district judge's in-court assessment of the testimony of the victim sales clerks is augmented by Williams's criminal history of armed robberies and the fact that Williams possessed a gun matching the one described by the victim sales clerks when he was apprehended in Indiana for yet another robbery. The judge additionally found it remarkable that neither the victim sales clerks nor other store personnel were injured because of Williams's possessing a gun during the robberies at issue in this case and noted the psychological harm that an armed robbery can cause a victim. Since the Sentencing Guidelines permit application of a § 2B3.1(b)(2)(C) enhancement for each robbery in which a gun was brandished or possessed, the district judge made a discretionary determination to include this enhancement only once in calculating Williams's offense level.[6] Review of the sentencing transcript makes clear that the district judge gave Williams a five-level enhancement for brandishing or possessing a gun during the subject robberies not because he thought that the Sentencing Guidelines mandated the five-level, upward

_____

[6] We note that, by specifically excluding robbery under § 2B3.1 from criminal counts that must be grouped in calculating an offense level, the Sentencing Guidelines permit a district judge not to group the counts or separate robberies and thereby make a consecutive calculation to determine the offense level or, as the judge did in this case, to group the counts in calculating the offense level so that an enhancement, such as gun possession during the robbery under § 2B3.1(b)(2)(C), would be included only once for all robberies in which a gun was possessed. U.S.S.G. § 3D1.2.

19

adjustment in his offense level but because he thought that it was warranted, and he elected to apply it only once. Remand for resentencing post-Booker is needless, because it is obvious from the district judge's statements and reasoning at Williams's sentencing that the § 2B3.1(b)(2)(C) enhancement would be applied again.

Consequently, remand for resentencing to consider Booker would be judicially inefficient, particularly, when Williams has not asserted any error in his guilty plea. The § 2B3.1(b)(2)(C) enhancement is the only aspect of the components of Williams's offense level about which he complains that implicates Booker. The district judge's explanation of his reasons for Williams's sentence included Williams's armed-robbery recidivism, which makes him a dangerous individual to be in society. The pre-Booker, discretionary calculation of Williams's sentence is evidenced by the judge's applying the § 2B3.1(b)(2)(C) enhancement only once for all the robberies to which Williams pled guilty, when there was evidence from the victim clerks that he brandished or possessed a gun in five of the six robberies, and in making Williams's 262 months of imprisonment concurrent for each robbery count to which he pled guilty instead of consecutive. Consequently, we are convinced that the district judge sentenced Williams at the upper end of the Sentencing Guidelines range, or 262 months of imprisonment,

20

because he considered that to be the appropriate sentence and not because he thought that the Sentencing Guidelines mandated that sentence. Accordingly, there is no Booker error to correct as to the § 2B3.1(b)(2)(C) enhancement on the facts of this case.

## B. Denial of Acceptance-of-Responsibility Departure

Related to his gun possession during the subject robberies, Williams also argues on appeal that the district court erred by not granting him a downward departure in his sentence for acceptance of responsibility under U.S.S.G. § 3E1.1, since he pled guilty to all counts. He contends that the probation officer's facts stated in the PSI and the district court's factfinding stated at sentencing regarding his possession of a firearm should not have had any effect on whether he received this reduction. We review a district court's factual findings concerning a reduction for acceptance of responsibility for clear error. United States v. Calhoon, 97 F.3d 518, 531 (11th Cir. 1996).

A defendant bears the burden of showing entitlement to a § 3E1.1 reduction. Id. "A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." U.S.S.G. § 3E1.1, comment. (n.3).[7] Although a

---

[7] The Supreme Court has held that the Sentencing Commission has "an express congressional delegation of authority for rulemaking"; hence, the Sentencing Guidelines "are the equivalent of legislative rules adopted by federal agencies," and the Commission's interpretive commentary regarding application of the Sentencing Guidelines is constitutional and "must be

guilty plea "will constitute significant evidence of acceptance of responsibility[,] . . . . this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." Id. Consequently, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." Id., comment. (n. 1(a)).

Williams asserts that his guilty plea was sufficient to show his acceptance of responsibility. As we have explained, based on the testimony of the victim clerks at Williams's sentencing and his recidivism history of armed robberies, the district judge determined that Williams not only had been untruthful with the probation officer but also had testified falsely at his plea proceeding and at his sentencing.[8] "The sentencing judge is in a unique position to evaluate a

---

given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Stinson v. United States, 508 U.S. 36, 45, 113 S.Ct. 1913, 1919 (1993) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217 (1945)).

[8] Specifically addressing § 3E1.1 at Williams's sentencing, the AUSA had the following exchange with the district judge:

> AUSA: . . .Your Honor, under the acceptance of responsibility Guidelines Application Note 1[(a)], a defendant who falsely denies or frivolously contests relevant conduct that the Court determines to be true has acted in a manner inconsistent with the acceptance of responsibility.
> That is the basis for the probation officer's recommendation. I will note also, Your Honor, that during Mr. Williams' Rule 11, when you asked him about the conduct he said almost immediately, "I did all of these things but I didn't use a gun."
> COURT: I recall that.

22

defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." Id. comment. (n.5). Because the sentencing judge explained his reasons for concluding that Williams had testified falsely in contrast to credible victim witnesses, Williams has failed to establish that it was clear error for the district judge to deny him a downward departure for acceptance of responsibility when the judge determined that Williams had falsely denied relevant conduct. Accordingly, we find no clear error in the sentencing judge's denying Williams a § 3E1.1 downward departure for acceptance of responsibility.

### III. CONCLUSION

---

> AUSA: And then when the probation officer interviewed Mr. Williams he also denied he had a gun in any of these. And I also note that the presentence report indicates in five out of the six the clerk said, in the Savannah area, that he used a gun.

R2 at 18-19. Referring to denying a downward departure for acceptance of responsibility, the district judge stated at sentencing:

> [T]he Court has no hesitancy, none at all, to adopt the probation officer's conclusions . . . and find that the defendant did use weapons, and therefore, loses the reduction for acceptance of responsibility.
>   . . . .
>         Now, I have denied—I have said I don't believe you, Mr. Williams. And I have not one shadow of a doubt that you have lied to the probation officer. You have lied to the police, and you have lied to me. So, that does not serve you well here.

Id. at 24, 25.

Williams has challenged his 262-month sentence following his guilty plea because of the enhancement for brandishing or possessing a gun in committing the robberies at issue in this appeal as well as his not receiving a downward departure in his offense level for pleading guilty to the six robberies charged. As we have explained post-<u>Booker</u>, Williams failed to establish plain error concerning the five-level enhancement in his offense level that he received under § 2B3.1(b)(2)(C), and the lack of credibility regarding his statements and testimony that he did not possess a gun when he committed the subject robberies precluded his eligibility for a § 3E1.1 downward departure for acceptance of responsibility because of his guilty pleas. Accordingly, Williams's sentence is **AFFIRMED.**