[DO NOT PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15017
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 14, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-60238-CR-WJZ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WADE PARKER,
a.k.a. George Toogood,
ISHWADE SUBRAN,
ANTHONY FOSTER,
a.k.a. Daymion Johnson,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(April 14, 2010)

Before EDMONDSON, BIRCH and FAY, Circuit Judges.

PER CURIAM:

Wade Parker, Ishwade Subran, and Anthony Foster appeal from their convictions, which were obtained after a joint trial. Each defendant argues that the evidence was insufficient to sustain one or more of his convictions. Parker and Subran contend that the evidence was insufficient to support their convictions for possessing a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1). Subran also argues that the evidence was insufficient to support his conviction for possessing a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g). Parker argues that the evidence was insufficient to sustain his conviction for unlawfully re-entering the United States after previously having been removed from the United States, in violation of 8 U.S.C. § 1326(a). In addition, Foster asserts that the evidence was insufficient to sustain his conviction for attempt to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 841(b)(1)(A).

The defendants also challenge various evidentiary rulings by the district court. Parker contends that the district court erred in permitting Officer Steve McKean to testify about the origin and purpose of the Street Terror Offender Program ("STOP"), in violation of Fed.R.Evid. 401, 403, 701, and 704(b). Foster has adopted this argument. In addition, Foster contends that this same testimony

2

violated Fed.R.Evid. 404(b). Subran argues that the district court erred by admitting into evidence his recorded statements concerning his probationary status and previous incarceration, asserting that this evidence violated Fed.R.Evid. 401, 402, 403, and 404(b). Foster argues that the district court erred in admitting a recorded exchange between himself and Subran, asserting that police officers acquired this recording in violation of his Fifth Amendment right to remain silent.

In addition, the defendants raise issues regarding the jury instructions and the prosecution's closing argument. Subran argues that the district court erred by declining to issue a missing witness instruction to the jury, and Foster has adopted this argument. Foster also asserts that the district court erred by permitting the prosecutor, during his closing and rebuttal arguments, to make certain statements concerning the credibility of the witnesses who testified at trial, as these remarks amounted to an impermissible comment on his failure to testify in his own defense. In addition, Foster argues that these same statements by the prosecutor amounted to an impermissible argument that he bore the burden of proving that he was innocent.

Finally, Foster also contends that the district court erred by ordering that his mandatory minimum sentence for his firearm offense under 18 U.S.C. § 924(c) must run consecutively to his mandatory minimum sentence for his drug

3

trafficking offense under 21 U.S.C. § 841.

For the reasons set forth below, we affirm.

## I.

In a superseding indictment, a federal grand jury charged Parker, Subran, Foster, and Patrick Aiken with the following: (1) robbery, in violation of 18 U.S.C. § 1951(a) ("Count 1"); (2) conspiracy to possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. § 846 ("Count 2"); (3) attempt to possess with intent to distribute at least five kilograms or more of cocaine, in violation of 21 U.S.C. § 841(b)(1)(A) ("Count 3"); (4) conspiracy to use and carry a firearm during and in relation to a crime of violence and a drug trafficking offense, as set forth in Counts 1-3, in violation of 18 U.S.C. § 924(o) ("Count 4"); (5) using and carrying a firearm during and in relation to a crime of violence and a drug trafficking offense, as set forth in Counts 1-3, in violation of 21 U.S.C. § 924(c)(1) and 18 U.S.C. § 2 ("Count 5"); and (6) possessing a firearm as a convicted felon, in violation of 18 U.S.C. §§ 922(g) and 924(e) ("Count 6"). In addition, the jury charged Parker with: (1) possessing a firearm as an alien unlawfully inside the United States, in violation of 18 U.S.C. § 922(g)(5) ("Count 7"); and (2) unlawfully entering the United States after having previously been removed from the United States, in violation of 8 U.S.C. § 1326(a) ("Count 8").

4

Foster filed a motion to sever his trial or, in the alternative, to exclude a recording of an exchange between himself and Subran. In his motion, Foster asserted that he had invoked his right to remain silent after he was arrested on September 19, 2007. Thereafter, police officers placed him, along with Aiken, in the backseat of a patrol car that was equipped with recording equipment. Foster alleged that, because neither he nor Aiken made inculpatory statements, the officers moved him to the backseat of another patrol car, which was occupied by Subran. This patrol car was also equipped with recording equipment. Once Foster was inside the second patrol car, Subran asked Foster if he thought that the police had discovered their car, and Foster responded, "Of course." Subran then told Foster that, had they conducted things differently on September 19, they possibly could have avoided arrest. Foster did not respond to this statement. Subran then asked Foster if the police had found a gun on his (Foster's) person. Foster did not respond to this statement. Foster argued that, if the government were permitted to introduce this recording at trial, this use of his silence in the face of Subran's incriminating accusations would violate his Fifth Amendment right to remain silent.

The magistrate judge held a hearing, during which she addressed Foster's motion. During the hearing, Foster argued that, after he was arrested and advised

of his *Miranda* rights, the police placed him in a patrol car with Subran as an interrogation technique. Foster argued that this action amounted to a violation of his Fifth Amendment right to remain silent, asserting that the police officers used Subran as an unwitting government agent to elicit incriminating statements from him.

The magistrate issued a report and recommendation, recommending that the court deny Foster's motion to sever his trial or exclude the patrol-car recording. The magistrate reasoned that the government was permitted to comment on a defendant's silence when it occurred after his arrest but before he received his *Miranda*[1] warnings. The court adopted the report and recommendation, noting that none of the defendants had objected to the report.

Subran filed a pre-trial discovery motion, requesting that the court order the government to disclose the name and address of a confidential informant ("CI") involved in the case, who was later identified as Langford Jackto. Subran asserted that Jackto made numerous attempts to convince him to commit illegal acts, and that he would not have become involved in criminal activity absent Jackto's misconduct. Subran argued that evidence of his interactions with Jackto could support an entrapment defense.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 458-71, 86 S.Ct. 1602, 1619-26, 16 L.Ed.2d 694 (1966).

The magistrate judge granted Subran's motion in part, finding that he had "proffered some minimal evidence of entrapment." The magistrate ordered that:

1.  The Government will inquire of the [CI] whether he/she desires to speak with defendant's counsel. If the [CI] desires to speak with counsel, the Government shall make arrangements for an interview to take place at a time convenient to all parties, and
2.  The Government shall, at time of trial, produce the [CI] if the defendant wishes to call the informant as his witness.

Aiken subsequently filed a motion to dismiss the indictment, in which he noted that the government had informed him that Jackto was not available to testify at trial. He argued that the court should dismiss the indictment because Jackto's testimony was necessary to his entrapment defense, and it would violate his due process rights to proceed without this material witness. Subran joined in Aiken's motion.

The government responded, explaining that Jackto's whereabouts were unknown. The government argued that the court should not dismiss the indictment because Aiken and Subran could not show that Jackto's testimony would be favorable to them.

After another hearing, the magistrate issued a report and recommendation, recommending that the court deny the motion to dismiss the indictment. In its motion, the magistrate noted that the only witness who testified at the hearing was Detective Jason Hendrick, who was employed by the Broward County Sheriff's

Office and supervised Jackto. Hendrick testified that Jackto was arrested on state charges and, in August 2007, was sentenced based on these charges. Thereafter, immigration authorities advised Jackto that he was removable based on his state conviction, and that he could choose between formal deportation and voluntary departure (*i.e.* self-deportation). Jackto informed Hendrick that he intended to deport himself. On October 3, 2007, Jackto told Hendrick that he would leave for his home country, Jamaica, the following day, October 4. On the morning of October 4, Hendrick went to Jackto's house and ascertained that he was not at home. Hendrick later discovered that Jackto did not board his scheduled flight. Based on these facts, the magistrate found that the government was not responsible for Jackto's unavailability. Moreover, the magistrate found that Aiken and Subran did not offer any proof that Jackto would have testified that he used impermissible tactics to induce them into criminal activity.

The court adopted the magistrate's report and recommendation. Aiken subsequently entered a guilty plea in this case.

Subran also filed a motion *in limine* to exclude recordings of post-arrest statements that he made to Parker and Foster while they were sitting in the back of a police car after their arrests. He explained that he had made statements concerning the following subjects: (1) the fact that he was on probation at the time

of his arrest; and (2) the fact that he previously had served a term of imprisonment, during which time he became friends with Jackto. He argued that these statements should be excluded as irrelevant under Fed.R.Evid. 401, 402, and 403.

The government responded, generally arguing that evidence of Subran's association with Jackto and probationary status were relevant in light of his entrapment defense. The government contended that evidence of Subran's relationship with Jackto provided an important context for analyzing the interactions between Subran and Jackto. The government also argued that Subran's probationary status was relevant, since the fact that he had been close to completing his probation at the time of the present offense made it less likely that he could have been coerced into participating in the offense.

Immediately before the trial began, the court denied Subran's motion to exclude his statements regarding his probationary status and his association with Jackto during his incarceration. The court reasoned that the probative value of this evidence was not outweighed by its potential to prejudice Subran. Subran objected to the court's ruling. Also before trial, the court and the parties agreed that any objection made by one defendant would be adopted by the other defendants, unless otherwise specified.

At trial, McKean, a special agent employed by the Bureau of Alcohol,

Tobacco, and Firearms ("ATF"), testified that he had helped to create STOP in 1991. McKean explained that the purpose of STOP was to investigate home-invasion narcotics robberies. He explained that STOP agents focus on, "identifying these groups that are committing these robberies in South Florida, trying to infiltrate these groups to confirm that they are doing these robberies and subsequently incarcerate them." McKean provided a brief summary of the systems that STOP previously used in order to apprehend robbers, and explained that these past systems were dangerous for government agents because they often led to shootings. Subran objected that this testimony was not relevant under Fed.R.Evid. 401, 402, and 403. The court overruled the objection.

McKean further testified that STOP currently used an investigation system whereby a CI would inform a government agent that he had been approached by an individual who wished to commit a narcotics robbery. The agent would then instruct the CI to tell the potential robbers that he could arrange a meeting with someone who was seeking individuals to rob a quantity of cocaine, which usually was 15 kilograms. Foster objected to McKean's testimony on the ground that it was not relevant because it was not specific to the present case. The court sustained the objection, and instructed the government to focus on the present case. Foster moved for a mistrial, arguing that McKean's testimony did not pertain to the

10

present case and that, instead, his testimony had focused on other cases and the activity of "dangerous drug gangs." He asserted that McKean's general testimony about drug gangs was "almost like [Fed.R.Evid.] 404(b) evidence" because it influenced the jury to believe that the defendants must be involved with these gangs. The court denied the motion.

McKean explained that Jackto provided him with information regarding the present case on August 20, 2007. He instructed Jackto to tell Subran that he (Jackto) knew someone who needed individuals to rob approximately 15 kilograms of cocaine from a stash house. McKean also instructed Jackto to set up a meeting where he, Jackto, and Subran could discuss the robbery. Jackto set up a meeting with Subran, which was to take place on August 24, 2007, at a Hooters Restaurant in Sunrise, Florida. McKean, Jackto, Subran, and Aiken attended the meeting. During the meeting, McKean introduced himself as a disgruntled drug courier working for a Colombian drug organization. When he told Subran and Aiken that he wanted them to rob the Colombian organization's stash house, he mentioned that there likely would be one or two armed individuals guarding the stash house. Aiken stated to McKean that he had no problem with armed guards. McKean also told Subran and Aiken that the location of the organization's stash houses changed with each delivery. He explained that the drug organization would call him to

11

inform him of the stash house location the day before he was scheduled to pick up cocaine for transport. The meeting ended with McKean and Aiken agreeing that they would meet again about the robbery in the future.

On August 29, 2007, McKean and Jackto met with Subran, Aiken, and Parker at the same restaurant. McKean reviewed the details of the robbery with Subran, Aiken, and Parker, including the fact that an armed individual would likely guard the stash house, and they told him that they were ready to commit the robbery soon. Subran suggested that they could assault the stash house as McKean entered it to pick up his cocaine for delivery. Subran provided McKean with his contact information. They agreed that McKean would contact Subran when a shipment of cocaine arrived. On September 2, Subran called McKean and told him that he wished to set up an additional meeting regarding the robbery. On September 4, McKean, Jackto, Parker, Subran, and Aiken again met at the Hooters in Sunrise. During this meeting, McKean stated that it seemed like the robbery would be difficult, and both Subran and Aiken assured McKean that the robbery would be easy.

McKean further testified that, on September 14 and 17, Subran called him in order to check on the status of the proposed robbery. On September 18, McKean called Subran and informed him that he had been in touch with the Colombian drug

12

organization, and that a shipment of cocaine would arrive on the following day. Shortly thereafter, Subran called McKean and informed him that they were ready to conduct the robbery. On September 19, McKean and Subran had several telephone conversations, during which McKean instructed Subran to get in touch with Jackto, and that Jackto would lead Subran, Parker, and Aiken to a location to meet with McKean. Thereafter, Subran, Parker, Aiken, and Foster met with Jackto at Hooters, and then followed Jackto to a gas station to meet with McKean. When McKean arrived at the gas station, he saw that Aiken, Parker, and Subran were in a silver Infiniti. He also saw a black Honda that Aiken had driven to one of their previous meetings, and saw that an individual, who he later learned to be Foster, was driving the Honda. From the gas station, Aiken, Subran, Parker, and Foster followed McKean to a building that he had identified as his undercover business.

McKean further testified that, after they all entered the undercover business, he reviewed the details of the robbery. He directed this conversation to Foster, specifically stating that they would steal 15 kilograms of cocaine. Either Subran or Parker assured McKean that Foster was familiar with the robbery details because he was part of their group. McKean averred that he reviewed all of the details of the robbery in Foster's presence, and that Foster did not indicate an unwillingness to go ahead with the robbery. Subran and Aiken informed McKean that, because

13

they had to pretend that McKean was not involved in the robbery scheme, they would tie him up along with the individuals guarding the stash house. Subran and Aiken also told McKean that he should remove his jewelry, because they were going to steal the guards' jewelry and did not want to steal his as well. Thereafter, McKean, Jackto, Subran, Parker, Aiken, and Foster remained inside the undercover business and waited for the drug organization to call McKean with the address of the stash house. During this time, McKean gave an arrest signal, and government agents arrested the defendants.

McKean further testified that, after the arrests, the officers placed the defendants into police cars equipped with recording devices. The officers initially placed Subran in the same patrol car as Aiken, but subsequently moved Subran into a patrol car with Foster. At this point in McKean's testimony, the government offered the tape of the recorded patrol-car conversation between Subran and Foster into evidence. None of the defendants raised an objection.

McKean and Hendrick took statements from Parker and Subran. Both Parker and Subran admitted that they had met with McKean for the purpose of robbing 15 kilograms of cocaine. In his statement, Subran added that Jackto had approached him about the robbery, and that he (Subran) then approached Aiken about the scheme. Subran also stated that, on the night of the robbery, he and

14

Aiken had arrived at the restaurant in Aiken's black Honda. Parker and Foster arrived in the silver Infiniti. When they reached the gas station, Aiken got into the Infiniti, and Foster switched cars to drive the Honda. Subran had not met Foster until the evening of the robbery.

On cross-examination, McKean confirmed that Jackto was paid approximately $50 a day for his involvement in the present case, and that he received a reward of $2,500 because the investigation was successful. McKean agreed that the term "entrapment" generally refers to a situation where a government agent or a CI pressures or persuades an unwilling individual to commit a criminal offense. When Jackto became a documented ATF informant in August 2007, ATF agents explained the meaning of entrapment to him, and instructed him that he was not permitted to engage in entrapment. In this case, McKean specifically instructed Jackto that he should tell Subran only that he knew someone who was interested in finding individuals to rob 15 kilograms of cocaine. McKean conceded that there were no recordings of Jackto's conversations with Subran that occurred before the August 24 meeting at Hooters. He did not know if "persistent pressure" had been placed on Subran in order to get him to attend meetings about the robbery. He reiterated that he instructed Jackto that his conduct should be limited to mentioning the robbery to Subran and setting up an initial meeting.

15

McKean admitted that he did not know whether Jackto had made additional statements about the robbery to Subran.

On cross-examination, McKean also testified that, when he, Jackto, Subran, Parker, Foster, and Aiken arrived at the undercover location, he observed that Aiken had been driving the silver Infiniti, and that Parker had been seated in the front passenger seat. Subran had been seated on the right-hand side of the car's backseat. McKean admitted that he did not know Jackto's current whereabouts, and that Jackto was "on the run." On the last occasion that he saw Jackto, McKean did not tell him that he needed to remain available in order to testify in the present case. McKean had been aware that immigration authorities were going to schedule Jackto for deportation, and that Jackto planned to deport himself.

At this point during McKean's testimony, the parties had a sidebar discussion regarding Jackto's unavailability. During this discussion, Subran asked that the court take judicial notice of the magistrate's order that the government was required to produce Jackto at trial if requested to do so by the defense. The court took judicial notice of this order and read the substance of this order aloud to the jury. McKean subsequently testified that he had been aware of the magistrate's order to produce Jackto upon the defense's request, and that he had searched for Jackto by checking various databases.

16

On redirect examination, McKean testified that, once he, Jackto, Parker, Foster, Subran and Aiken were inside the undercover business, he asked Foster if he was fully aware of what they were about to do. Before Foster could answer the question, Aiken assured McKean that Foster was aware of the robbery plan. McKean then stated that he was asking about Foster's presence at the undercover business because he wanted to make sure that their plan went forward without any "surprises." Parker told McKean that Foster knew "everything," and that Foster would be accompanying himself and Aiken into the stash house to conduct the robbery. Subran would remain in the car as the getaway driver. Foster did not object to these statements regarding his role in the robbery. While everyone was still inside the undercover business, and in Foster's presence, Parker demonstrated the method by which they would enter the stash house. Parker pointed at Foster and stated that both he and Foster would enter the house, and Foster did not object to this arrangement. Thereafter, McKean stated that he would personally receive five kilograms of cocaine from the robbery, and Foster responded by nodding and smiling.

After McKean concluded his testimony, the government played a tape of the patrol-car conversation between Subran and Foster in open court. None of the defendants raised an objection. In addition, the government published to the jury

the tapes of Subran's recorded patrol-car statements regarding his probationary status and previous imprisonment.

William Flanery, an ATF agent, testified that he participated in the present case as a member of the arrest team. Flanery had observed another agent arrest Foster. Flanery further observed that the other agent asked Foster whether he had a weapon, and Foster replied that he had a weapon in the waistband of his pants. Flanery then saw that the agent instructed Foster, who had been lying on the floor, to stand up. When Foster stood up, a gun fell out of his pants. Flanery secured the gun and discovered that it was loaded.

Pamela Bradley, an ATF special agent and expert on interstate firearms, testified that she had assisted with the present case by collecting and preserving evidence. After the defendants were arrested, she searched the silver Infiniti and discovered that a loaded pistol was between the driver's seat and the center console. Based on her examination of this firearm, Bradley opined that it was manufactured outside of the state of Florida.

After Bradley concluded her testimony, the government and Subran stipulated that Subran was convicted of a felony before August 24, 2007.

Imtiaz Baksh, an intelligence resource specialist employed by the ATF, testified that he had analyzed the defendants', McKean's, and Jackto's telephone

18

records.  As a result of this analysis, he discovered that, between July 1, 2007, and September 19, 2007, there were 115 telephone calls between Foster and Parker. Only five of these calls occurred between July 1 and August 28.  Between August 29 and September 3, there were 15 telephone calls between Foster and Parker. Between September 4 and September 18, there were 84 telephone calls between Foster and Parker.  Of these 84 calls, Foster called Parker 72 times, and Parker made 12 calls to Foster.  On September 19, Foster called Parker 11 times, and Parker called Foster 7 times.  On cross-examination, Baksh testified that, between July 25, 2007, and August 24, 2007, there were numerous calls between Jackto and Subran, and that most of these calls were initiated by Jackto.  Between 10:13 a.m. and 1:26 p.m. on August 24, Jackto called Subran nine times.

James Kocak, a special agent employed by U.S. Immigration and Customs Enforcement ("ICE"), testified that he had been asked to investigate Parker's immigration status.  Kocak reviewed Parker's alien file ("A-file"), and learned that Parker was a citizen of Jamaica, who previously had been removed from the United States.  Kocak confirmed that Parker's A-file included Parker's I-205 form, which documents an alien's removal from the United States.  As the custodian of Foster's I-205 form, Kocak testified that this form showed that Parker was removed from the United States to Jamaica in October 2000.  The form bore

19

Parker's photograph. The form was signed by Isaiah Hughes, an ICE deportation officer. By signing the form, Hughes had attested that he witnessed Parker's removal from the United States. Kocak also reviewed Foster's I-294 form, which reflected that he was not permitted to re-enter the United States. Kocak identified a document referred to as a "certificate of non-existence of record," which reflected that he had inquired as to whether Parker had received permission to return to the United States, and that no documents existed that indicated that Parker had received such permission.

On cross-examination, Kocak testified that he did not personally witness Parker leave the United States in October 2000. On redirect examination, he testified that the I-205 form provided the signing deportation officer with a space to identify the means by which he verified the alien's departure, if such officer had not personally witnessed the departure. Hughes had not written anything in this space on Parker's I-205 form, thereby attesting that he personally witnessed Parker's departure.

Subran moved for a judgment of acquittal as to Counts 5 and 6, arguing that there was no evidence that he actually or constructively possessed a firearm, or that he aided and abetted a codefendant in possessing a firearm. Parker adopted Subran's arguments as to Counts 5 and 6. In addition, Parker moved for a

20

judgment of acquittal as to Counts 7 and 8, arguing that the government did not meet its burden of proving that he had been physically removed from the United States. Parker emphasized that Kocak had no personal knowledge of his removal from the United States. Foster moved for a judgment of acquittal as to Counts 1-4, arguing, among other things, that there was no evidence that he knew that a robbery was going to occur on September 19.

Foster renewed his motion for a mistrial based on McKean's testimony regarding the STOP program. Subran and Foster adopted this motion. The court denied the motion, finding that, even if McKean's testimony regarding STOP were prejudicial, it did not deprive the defendants of a fundamentally fair trial.

Before the defense presented its case, Subran noted, outside of the jury's presence, that he had intended to elicit Jackto's testimony but could not do so. The government confirmed that it did not know of Jackto's whereabouts. Subran also stated that, because the court had ruled that his recorded statements regarding his probation and incarceration were admissible, he would deal with this evidence by discussing it in his own testimony. He noted that he did not waive his objection to his recorded statements being admitted into evidence.

Thereafter, Detective Hendrick testified consistently with the testimony he had provided at the hearing before the magistrate regarding Aiken's motion to

dismiss the indictment. He added that, late September or early October, Jackto told Hendrick that he was leaving for Jamaica, but did not indicate that he would be leaving immediately. Hendrick responded by telling Jackto that he needed to be available to testify in the present case and other cases. Part of Jackto's agreement with the government to work as a CI was to remain available to provide testimony, and he violated this agreement by leaving for Jamaica before the trial in the present case. Hendrick and Jackto came to an agreement whereby, after he deported himself, the ATF would work to ensure that he was readmitted into the country so that he could fulfill this obligations as a CI. In order for the ATF to be able to do this, Jackto would need to deport himself rather than be forcibly deported. On October 4, Hendrick went to the airport in order to ascertain whether Jackto boarded his scheduled flight to Jamaica. He discovered that Jackto had not boarded the flight. During the middle of October, Hendrick contacted McKean, the Office of Immigration and Customs Enforcement ("ICE"), and the U.S. State Department in an attempt to discover Jackto's whereabouts. Federal agencies searched for Jackto, and Hendrick visited Jackto's former home twice and spoke with Jackto's previous attorney, but these efforts did not reveal Jackto's whereabouts.

Subran testified that he met Jackto in 2006, while they were both in prison at

the Broward County Jail. Before this time, he had seen Jackto at social gatherings, but had not spoken with him. Based on their conversations in prison, Jackto knew that Subran's mother had cancer. In June 2007, after both Jackto and Subran had been released from prison, Jackto called Subran and visited him at his (Subran's) apartment. During this visit, Subran informed Jackto that his mother's cancer had worsened, and that he was "barely surviving" on the money his mother sent to him from Jamaica. On July 25, 2007, Jackto called Subran and proposed that Subran participate in a cocaine robbery. Subran told Jackto that he was not interested in the robbery but, at Jackto's request, gave him permission to come over to his apartment. Once he arrived at Subran's apartment, Jackto again stated that he knew someone who wanted to conduct a robbery of cocaine. Jackto told Subran that the robbery would be easy, and that he knew that Subran needed the money. Subran reiterated that he was not interested, and Jackto ceased to discuss the proposition.

Subran further testified that Jackto mentioned the robbery to him again at some point between July 25 and August 20, informing him that the robbery would involve 15 kilograms of cocaine. Subran told Jackto that he would consider the proposition. Jackto and Subran met again on August 20 and, during this meeting, Jackto reiterated that the robbery would be easy, and also told Subran that he

23

would receive $40,000 from his participation in the robbery, which he could send to his ailing mother. Subran accepted, reasoning that $40,000 was a large payment in exchange for minimal effort. Subran admitted that, while he did not plan on entering the stash house on September 19, he had agreed to act as the get-away driver during the robbery. He conceded that he knew that the robbery would involve a gun. On cross-examination, Subran admitted that, on September 19, he knew that there was a gun in the Infiniti.

After Subran concluded his testimony, the defendants renewed their motions for judgments of acquittal, which the court denied. Subran requested a missing witness instruction, arguing that the government was responsible for Jackto's unavailability because Hendrick did not stop him from leaving the United States. The court denied the request, reasoning that it had allowed Subran "wide latitude" in presenting his evidence, and that the jury could weigh that evidence for itself.

In its instructions to the jury, the court instructed the jury that Subran presented the defense of entrapment, explaining that a defendant is entrapped where, "law enforcement officers or cooperating individuals under their direction induce or persuade a defendant to commit a crime that the defendant had no previous intent to commit." In addition, the court instructed the jury that a defendant is not required to prove his innocence. The court also instructed the

24

jury, at length, that the government was required to prove a defendant's guilt beyond a reasonable doubt.

During its closing statement, the government remarked:

The government submits to you that as you begin to use your common sense, as you weigh the credibility of the witnesses, the judge has already given you the questions you should ask. Did the witness impress you as one who was telling the truth. Several witnesses in this case, Special Agent McKean[,] Special Agent Flanery, Special Agent Bradley, Special Agent Ray Roldan, Deputy U.S. Marshal Cooper, Special Agent Justin Kocak, JoAnn Meisenheimer, Nathan Kingsale, Imtiaz Baksh, Jason Hendrick, Steven Yuresko[,] and one of the defendants in this case, Ishwade Subran, ask yourself that question about all of those witnesses.

None of the defendants objected to this statement. During its rebuttal argument, the government stated:

Here's the thing about the witnesses you heard from. Everyone gets in that same witness box, takes the same oath and swears to tell the same truth. There's a slight difference when one of those witnesses comes from this table. Here's the difference. That witness is the only witness that you've heard from in this case that at the time they sat in that chair had heard everything else that every other witness that sat in that chair had said. That's the one witness, the one that comes from this table, that by the time they get there have seen every single thing that's on the table.

None of the defendants objected to this statement.

The jury found Subran guilty as to Counts 3-6, and not guilty as to Counts 1 and 2. The jury found Foster guilty as to Counts 1-6, and Parker guilty as to Counts 1-8.

25

In Foster's presentence investigation report ("PSI"), the probation officer grouped Counts 1, 2, 3, 4, and 6 together pursuant to U.S.S.G. § 3D1.2(c). Having grouped these offenses together, the officer determined that Foster's base offense level and total offense level was 34 under U.S.S.G. § 2D1.1(a)(3). The officer further determined that, based on Foster's offense level of 34 and criminal history category of III, the applicable guideline range was 188 to 235 months' imprisonment. As to Count 5, the officer found that, pursuant to 18 U.S.C. § 924(c)(1)(A), Foster was subject to a statutory mandatory term of 60 months' imprisonment, to run consecutively to any other term of imprisonment imposed. Foster did not file any objections to the PSI.

At sentencing, Foster stated that he had no objections to the PSI. Foster further stated that he understood that the court was required to impose a sentence of at least 60 months' imprisonment as to Count 5, and that this sentence would run consecutively to any other term of imprisonment. The court determined that it was appropriate to sentence Foster at the middle of his guideline range, and sentenced him to 260 months' imprisonment. The court noted that this term of imprisonment included a consecutive term of 60 months' imprisonment as to Count 5. The court asked the parties if there were any objections to its factual findings and legal conclusions, and the parties stated that they had none. The court

26

also asked if the parties had any objections to the sentence or the manner in which it was imposed, and the parties averred that there were none.

## II.

"We review the sufficiency of the evidence presented at trial *de novo*. The evidence is viewed in the light most favorable to the government, with all inferences and credibility choices drawn in the government's favor." *United States v. LeCroy*, 441 F.3d 914, 924 (11th Cir. 2006). "It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Young*, 906 F.2d 615, 618 (11th Cir.1990).

In order to sustain a conviction under 18 U.S.C. § 924(c), the government must show that a defendant used, carried, or possessed a firearm in furtherance of a drug trafficking offense or a crime of violence. 18 U.S.C. § 924(c); *United States v. Gunn*, 369 F.3d 1229, 1234 (11th Cir. 2004). "Possession may be actual or constructive, joint or sole." *Id.* "In order to establish constructive possession, the government must show that the defendant exercised ownership, dominion, or control over the firearm or the vehicle concealing the firearm." *Id.* We have held that a defendant constructively possessed a firearm based on his "knowledge of the

27

firearms coupled with his leadership role and proximity to the firearms." *Id.* at 1236. Also, the government may demonstrate a defendant's guilt under § 924(c) by showing that his co-conspirator's possession of a firearm was reasonably foreseeable. *Id.*

In addition to demonstrating possession, the government must establish that the defendant possessed a firearm in furtherance of a drug trafficking crime or a crime of violence. *United States v. Timmons*, 283 F.3d 1246, 1252-53 (11th Cir. 2002). In order to meet its burden of proof as to this element, the government must show a nexus between the firearm and the criminal activity, or, in other words, that the defendant used the firearm to "advance or promote" the criminal activity. *Id.* In order to sustain a conviction under 18 U.S.C. § 922(g)(1), the government must prove that a defendant: (1) previously was convicted of a felony offense; and (2) knowingly possessed a firearm. 18 U.S.C. § 922(g)(1); *Gunn*, 369 F.3d at 1235.

Here, the evidence was sufficient to sustain both Subran's and Parker's convictions for possessing a firearm in furtherance of a drug trafficking crime and they may be affirmed under the theory of co-conspirator liability. One of Subran's and Parker's co-conspirators, Aiken, drove the Infiniti on September 19 while a gun was in between the driver's seat and the car's center console. Thus, Aiken

exercised dominion over both the Infiniti and the gun inside the Infiniti and, as a result, constructively possessed a firearm. In his testimony, Subran conceded that he was aware that the narcotics robbery would involve a gun, and that the Infiniti contained a gun. Thus, it is clear that it was reasonably foreseeable to Subran that the robbery would involve a gun. Because Parker was present at the August 29, 2007 meeting at Hooters, where McKean informed the defendants that at least one armed individual would guard the stash house, it was also reasonably foreseeable to Parker that the robbery would involve a gun. In addition, both Subran and Parker stated to police officers that they had met with McKean for the purpose of planning a narcotics robbery. As a result, the evidence showed that the object of the conspiracy in this case was the theft of narcotics, and a jury could reasonably infer that the gun inside the Infiniti would serve the purpose of countering the armed guards at the stash house.

In addition, the evidence was sufficient to sustain Subran's conviction for possessing a firearm as a convicted felon under § 922(g). As noted above, Subran was aware that the robbery would involve a gun, and that the car in which he was a passenger on September 19 contained a gun. Moreover, Subran played an active role in coordinating the offense by telling Aiken about the scheme, attending the preparatory meetings with McKean, and calling McKean several times to arrange

meetings and check on the status of the robbery. Subran called McKean on September 18 in order to let McKean know that they were ready to commit the robbery, and, during meetings about the robbery, suggested when and how to enter the stash house, and also suggested that McKean should remove his jewelry before the robbery began. Thus, Subran played an active role in coordinating this offense, knew about the gun in the Infiniti, and was in close proximity to this gun. As a result, the jury could reasonably have concluded that Subran constructively possessed a gun because he had the power and intention to exercise control over a gun during the narcotics robbery.

### III.

In order to demonstrate that a defendant is guilty of attempt to possess with intent to distribute cocaine, the government must show that the defendant "(1) acted with the kind of culpability required to possess cocaine knowingly and willfully and with the intent to distribute it; and (2) engaged in conduct which constitutes a substantial step toward the commission of the crime under circumstances strongly corroborative of their criminal intent." *United States v. McDowell*, 250 F.3d 1354, 1365 (11th Cir. 2001).

Here, the evidence was sufficient to support Foster's conviction for attempt to possess with intent to distribute cocaine. Baksh testified that there was an

30

unusually high level of telephone calls between Foster and Parker between August 28 and September 19, which coincided with the period during which Parker, Subran, Aiken, Jackto, and McKean planned the narcotics robbery. Foster followed his codefendants to the undercover business, and carried a concealed gun with him when he walked inside the undercover business. McKean, Subran, Aiken, and Parker discussed the robbery in Foster's presence, and Foster did not indicate that he was unaware of the robbery, or unwilling to go forward with the robbery. Moreover, McKean specifically directed his review of the robbery details to Foster, and, when he questioned Foster's presence, Parker assured McKean that Foster knew "everything." In addition, when McKean stated that he would receive five kilograms of cocaine from the robbery, Foster smiled and nodded. Finally, Foster did not object when Parker physically demonstrated the method by which he would enter the stash house, pointed at Foster, and announced that Foster would accompany him.

Based on the conversations inside the undercover business, the jury reasonably could find that Foster was aware of the robbery and its object. Moreover, because McKean testified that he reviewed all of the details of the robbery in Foster's presence, the jury could infer that Foster was aware that the undercover building was being used as preparatory site for the defendants to gather

and review their tactics before committing the robbery. Because Foster arrived at this building on September 19, remained in the building while the group waited for the call from the drug organization, and carried a gun on his person, the jury reasonably could have concluded that Foster took a substantial step toward possessing cocaine.

## IV.

In order to prove that a defendant violated 8 U.S.C. § 1326(a), the government must show that the defendant is: (1) an alien; (2) who previously has been deported from the United States; and (3) subsequently was found in the United States without the Attorney General's consent to apply for readmission. *United States v. Henry*, 111 F.3d 111, 113 (11th Cir. 1997).

We have held that an alien's warrant of deportation constitutes admissible evidence of his guilt under § 1326(a). *United States v. Cantellano*, 430 F.3d 1142, 1145-56 (11th Cir. 2005). Such a document constitutes a routine record reflecting "where, when, and how a deportee left the country." *Id.* at 1145. Because a deportation warrant constitutes admissible evidence relevant to a defendant's previous deportation, and the jury here was presented with such evidence, there was sufficient evidence to support the jury's determination that Parker violated § 1326(a).

We review a district court's decision regarding the admissibility of evidence for abuse of discretion. *United States v. Schlei*, 122 F.3d 944, 990 (11th Cir. 1997). Where a defendant failed to object to evidence based on a particular evidentiary ground before the district court, we review the defendant's argument that the evidence violated that particular evidentiary rule for plain error. *United States v. Ruiz*, 253 F.3d 634, 640 (11th Cir. 2001). Under the plain-error standard of review, we will correct an error "only if there was (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Williams*, 408 F.3d 745, 748 (11th Cir. 2005) (quotation omitted). If these conditions are met, we may correct the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quotation omitted).

Under Fed.R.Evid. 401, evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." Fed.R.Evid. 401. In general, relevant evidence is admissible at trial. Fed.R.Evid. 402. Rule 403 provides, in part, that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed.R.Evid. 403. "In evaluating the district court's ruling

33

under Rule 403, we view the evidence in the light most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Bradberry*, 466 F.3d 1249, 1253 (11th Cir. 2006). "The court's discretion to exclude evidence under Rule 403 is narrowly circumscribed . . . Rule 403 is an extraordinary remedy which should be used only sparingly since it permits the trial court to exclude concededly probative evidence." *United States v. Church*, 955 F.2d 688, 700 (11th Cir. 1992) (quotation and alteration omitted).

Rule 404 generally provides that "evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith." Fed.R.Evid. 404(a). Under Fed.R.Evid. 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b).

Only extrinsic evidence is subject to the requirements of Fed.R.Evid. 404(b). *Schlei*, 122 F.3d at 990. "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive, and set-up of the crime, is

34

properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (quotation and alteration omitted). Such evidence "is not extrinsic under Rule 404(b), and thus falls outside the scope of the Rule. *Id.* (quotation omitted); *United States v. Richardson*, 764 F.2d 1514, 1521 (11th Cir. 1985) ("[t]hese prior wrongs were not extrinsic to the charged crimes because the evidence concerning prior crimes was inextricably intertwined with the evidence of the charged crime"). "[E]vidence of criminal activity other than the charged offense, whether inside or outside the scope of Rule 404(b), must still satisfy the requirements of Fed.R.Evid. 403." *Edouard,* 485 F.3d at 1344.

Under Fed.R.Evid. 701, where a witness is not qualified as an expert, he may offer his opinion on a matter only where his opinion is: (1) rationally based on his own perception; (2) helpful to a clear understanding of his testimony or a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge. Fed.R.Evid. 701. We have recognized that "an experienced narcotics agent may testify about the significance of certain conduct or methods of operation unique to the drug distribution business." *United States v. Butler*, 102 F.3d 1191, 1199 (11th Cir. 1997). Under Fed.R.Evid. 704(b), an expert witness may not testify as to

35

whether a defendant did or did not have the mental state or condition constituting an element of the crime. Fed.R.Evid. 704(b).

Evidence admitted in violation of Rule 404(b), 701, or 403 is harmless when there otherwise was substantial evidence of the defendant's guilt. *United States v. Chavez*, 204 F.3d 1305, 1317 (11th Cir. 2000) (Rule 404(b)); *United States v. Dulcio*, 441 F.3d 1269, 1275 (11th Cir. 2006); *Gunn*, 369 F.3d at 1236 (Rule 403).

### i. *Subran's statements regarding his probationary status and previous imprisonment*

Subran's argument that his recorded statements regarding his probationary status and previous imprisonment should not have been admitted into evidence because they were irrelevant lacks merit. Because Subran raised an entrapment defense, the fact that he developed a friendly relationship with Jackto while they were in prison was relevant, as it caused it to be more likely that he would look favorably upon a drug robbery proposed by Jackto. In addition, Subran's statements about his probation status were relevant in light of his entrapment defense, because the fact that he was on probation made it less probable that he could be coerced into committing a crime. While Subran asserts that the jury's hearing that he previously was incarcerated and was on probation at the time of the present offense was prejudicial, the jury otherwise would have learned that Subran had been incarcerated because he stipulated that he was a convicted felon.

36

Accordingly, viewing this evidence in the light most favorable to admission, the district court did not abuse its discretion in admitting Subran's statements about his probation and previous incarceration into evidence.

Because Subran did not object to the introduction of his recorded statements under Fed.R.Evid. 404(b), we review his 404(b) argument for plain error. The district court did not commit plain error under Rule 404(b) by admitting Subran's statements about his probationary status and his previous incarceration. The fact that Subran met Jackto while they were in prison provided a context for why Jackto approached Subran about the narcotics robbery, as well as for why Subran entertained the proposal. This same information provided an explanation for the set-up of the crime. In addition, Subran's argument that his probationary status was not probative of any subject other than his character lacks merit, as it provided a context relevant to his entrapment defense. Moreover, even if the district court erred in admitting this evidence, this error was not prejudicial to Subran in light of the substantial evidence of his guilt. Because the admission of this evidence did not prejudice Subran, any error in this regard could not constitute plain error.

### ii. *Officer McKean's testimony about the origin and purpose of STOP*

The district court did not abuse its discretion by admitting Officer McKean's testimony about STOP over the defendants' objections under Fed.R.Evid. 401 and

403. This evidence was relevant because Subran sought to raise an entrapment defense, and evidence that STOP typically used CI's to propose drug robberies to defendants made it less probable that Jackto unfairly targeted Subran in an attempt to coerce him into illegal activity. In addition, this testimony provided a context for the investigation in this case. Accordingly, viewing this evidence in the light most favorable to admission, its probative value was not outweighed by its potential prejudice.

We review Parker's argument that McKean's STOP testimony violated Fed.R.Evid. 701 and 704(b) for plain error, because none of the defendants objected to his testimony based on either of these rules at trial. The district court did not commit error, let alone plain error, under Fed.R.Evid. 701 because McKean's testimony constituted a mere explanation of the purpose of the STOP program and the manner in which it operated, and did not include opinions or inferences. To the extent that McKean's testimony about the origin, purpose, and methods of STOP included a lay witness opinion, it was based on his personal knowledge because he participated in creating the program. Moreover, this testimony was helpful to the jury's understanding of a fact in issue because Subran had raised an entrapment defense. Finally, this testimony was not based on scientific, technical, or highly specialized knowledge, apart from knowledge of law

38

enforcement tactics, of which McKean had personal knowledge.

In addition, Parker's argument that McKean's testimony violated Fed.R.Evid. 704(b) also fails to satisfy plain-error review, because McKean did not testify as an expert and, in any event, his testimony about STOP did not include an opinion about mental states of the defendants in this case.

Finally, Foster's argument that McKean's STOP testimony violated Rule 404(b) lacks merit. Rule 404(b) prohibits the use of a defendant's prior bad act to show action in conformity therewith, and McKean's testimony about STOP did not indicate that Foster or his codefendants had previously committed narcotics robberies or other bad acts.

## VI.

In *Miranda*, the Supreme Court held that the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612. "It is well established that after *Miranda* warnings have been given, the government cannot fairly use a defendant's silence against him at trial as evidence of guilt." *United States v. Tenorio*, 69 F.3d 1103, 1106 (11th Cir. 1995). This is because the *Miranda* warnings carry an implied

assurance that a defendant's silence cannot be used against him at trial. *Id.*

Nevertheless, "[t]he government may comment on a defendant's silence where it occurs after arrest, but before *Miranda* warnings are given." *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991).

The Supreme Court has clarified that "interrogation" within the meaning of *Miranda* encompasses both "express questioning" and its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980). The Supreme Court defined "functional equivalent" as "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. at 1690. The Supreme Court has made clear, however, that "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself." *Arizona v. Mauro*, 481 U.S. 520, 529-30, 107 S.Ct. 1931, 1936, 95 L.Ed.2d 458 (1987). Thus, there is no "interrogation" where law enforcement officers are mere silent third parties present during conversations between the accused and his spouse. *Id.* Similarly, "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990).

40

We review Foster's arguments as to this issue for plain error, because he did not object to the introduction of the recorded exchange between himself and Subran at trial, and did not file objections to the magistrate's report and recommendation concerning this matter. The district court did not plainly err in admitting the recorded patrol-car exchange between Foster and Subran. While the record does not establish whether Foster had received *Miranda* warnings at the time of his exchange with Subran, his argument lacks merit regardless of whether he had received *Miranda* warnings. To the extent that Foster had not received *Miranda* warnings, his silence constituted admissible evidence that could be used against him at trial.

Even if Foster had received *Miranda* warnings, the admission of the recording would not violate *Miranda* because Foster was not under custodial interrogation at the time of his exchange with Subran. Placing arrestees in the back of a police car for transport is not an action reasonably calculated to elicit an incriminating response from a defendant. While the police may have equipped the patrol car with recording devices in the hope that defendants would make incriminating statements, this does not rise to the level of interrogation. Rather, in the situation here, the police were in the position of a third party overhearing a conversation between two codefendants. Accordingly, regardless of whether the

41

officers intentionally placed Foster and Subran together in the hope that they would make incriminating statements to each other, and regardless of whether the government's introduction of this recording at trial constituted a comment on Foster's silence, the admission of this recording into evidence did not violate Foster's Fifth Amendment right to remain silent. Moreover, even if the admission of this recording constituted error, the error did not prejudice Foster in light of the substantial evidence against him.

## VII.

We review the district court's refusal to give a missing witness instruction for abuse of discretion. *United States v. Link*, 921 F.2d 1523, 1528-29 (11th Cir. 1991). "When a witness is peculiarly within the control of one party, and the witness'[s] testimony would elucidate facts in issue, an instruction is appropriate regarding the permissible inference which the jury may draw from the party's failure to call the witness." *United States v. Nahoom*, 791 F.2d 841, 846 (11th Cir. 1986). A district court is not required to give a missing witness instruction where the missing witness's testimony would not have been favorable to the defendant. *Link*, 921 F.2d at 1529. Even if the district court erred in declining to give a missing witness instruction, we will affirm where the error could not have affected the jury's verdict. *Nahoom*, 791 F.2d at 846.

Any error the district court may have made in declining to issue a missing witness instruction was harmless and could not have affected the jury's verdict. The jury was presented with evidence that Jackto was unavailable, as well as with the reasons why he was unavailable. In addition, the jury heard evidence regarding the government's role in the situation. The jury also heard that the government had been ordered to produce Jackto at trial in the event that the defense wished to call him as a witness. The jury further heard that Jackto would receive $2,500 if the investigation was successful. Finally, the jury heard Subran's testimony concerning his unrecorded conversations with Jackto, and was presented with telephone records regarding the frequency of telephone calls between Jackto and Subran. As a result, the jury was presented with ample evidence to enable it to determine whether it was appropriate to infer that Jackto's testimony would have been favorable to the defendants. In addition, it also heard sufficient evidence to enable it to determine whether to accept Subran's entrapment defense. For these reasons, any error the district court may have made in declining to issue a missing witness instruction was harmless.

## VIII.

The Fifth Amendment prohibits a prosecutor from directly or indirectly commenting on a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609,

615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965); *United States v. Knowles*, 66

F.3d 1146, 1162 (11th Cir. 1995).  We have explained that:

> A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.  The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury necessarily would have done so.  The defendant bears the burden of establishing the existence of one of the two criteria. The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement.

*Knowles*, 66 F.3d at 1162-63 (quotations omitted).

"Prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence."  *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992).  Even if a prosecutor errs by making such a remark, this error may be rendered harmless by a curative instruction to the jury.  *Id.* at 1087.

Because none of the defendants objected to the prosecutor's statements, we review Foster's arguments concerning these statements for plain error.  Here, the prosecutor's statements during closing and rebuttal arguments were focused on the credibility of the witnesses who testified in this case.  The prosecutor referred to Subran's testimony only to point out that Subran had heard all of the evidence

44

before he testified.  None of these comments were of such a nature that they would "necessarily" cause the jury to construe them as comments on Foster's failure to testify.

Because the prosecutor's comments only asked the jury to consider the credibility of the witnesses, these remarks also did not constitute an impermissible burden-shifting argument. Moreover, the court had specifically instructed the jury that the government, and not the defendants, bore the burden of proof in this case. Thus, the district court did not err, let alone plainly err, in permitting the prosecutor to make the challenged statements.

## IX.

Because Foster did not raise his sentencing argument before the district court, we review it for plain error.

In *United States v. Segarra*, we considered whether the exception clause in § 924(c) prohibits consecutive sentences where a defendant is convicted of both a drug offense and a firearm offense that carry statutory minimum sentences.  582 F.3d 1269, 1270 (11th Cir. 2009), *petition for cert. filed*, (U.S. Jan. 8, 2010) (No. 09-8536).  The defendant had been sentenced to 120 months' imprisonment for his drug trafficking conviction under 21 U.S.C. § 841, and a mandatory minimum consecutive sentence of 60 months' imprisonment for his possession of a firearm

45

in furtherance of a drug trafficking offense, under § 924(c).  *Id.* at 1271.  The defendant argued that, because he was subject to a ten-year mandatory minimum sentence for his drug trafficking offense, § 924(c)'s exception clause prohibited the court from sentencing him to a 60-month mandatory consecutive sentence for his firearm offense.  *Id.* at 1272.  We rejected his argument, holding that, under § 924(c), the district court properly ordered that the defendant's 60-month sentence for his firearm offense should run consecutively to his term of imprisonment for the drug trafficking offense.  *Id.* at 1272-73.

Because Foster's argument is identical to that raised by the defendant in *Segarra*, *Segarra* precludes Foster's sentencing argument, and the district court did not err, let alone plainly err, in this regard.

**AFFIRMED.**